JULIUS FORSTMANN & Co. *v.* UNITED STATES (No. 4307)[1]

---

[1] C. A. D. 149.

United States Court of Customs and Patent Appeals, October 28, 1940

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* and *Samuel M. Richardson*, of counsel), for appellant.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard H. Welsh* and *Richard E. FitzGibbon*, Special Attorneys, of counsel) for the United States.

[Oral argument October 2, 1940, by Mr. Samuel M. Richardson and Mr. FitzGibbon]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

In September, 1932, appellant imported certain machines which were classified by the Collector of Customs at the port of New York as textile machinery, not specially provided for, under paragraph 372 of the Tariff Act of 1930, and which were held to be dutiable thereunder at the rate of 40 per centum ad valorem. Appellant protested against the classification and claimed the merchandise to be properly dutiable at the rate of 35 per centum ad valorem under a provision in paragraph 353 of said act for "articles having as an essential feature an electrical element or device," or at 27½ per centum ad valorem under paragraph 372, *supra*, as machines or parts thereof, not specially provided for. The latter claim was not supported by any evidence.

The suit was tried in the United States Customs Court, Second Division, and submitted for decision upon a record which consisted of what was intended to be an agreed statement of facts. Upon that record the trial court overruled the claims of the importer and held that the merchandise was more specifically classifiable as determined by the collector than as articles having as an essential feature an electrical element or device. From the judgment of the trial court appellant appealed, and this court reversed the said judgment and remanded

the case for a new trial for the reason that the said agreed statement of facts was a stipulation of law. *Julius Forstmann & Co.* v. *United States*, 26 C. C. P. A. (Customs) 336, C. A. D. 37.

Upon remand the case was again heard by the trial court and submitted upon a stipulation as follows:

It is Hereby Stipulated and Agreed between counsel for the plaintiff and the Assistant Attorney General for the United States that:

1. The merchandise covered by this protest consists of one wet decatizing machine, two double nap raising machines and two cloth tenterizing machines.

2. All of these machines are in chief value of metal.

3. The wet decatizing machine consists of three vats, each of which is approximately 8' x 3' x 2'6''. Connected to each of these vats is a centrifugal pump driven by an electric motor directed connected. Over these three vats is a track upon which an overhead hoist runs. This hoist or traveling crane is driven by a directly connected electric motor to propel it along the tracks and the hoist consists of a revolving drum driven by a directly connected electric motor. Attached to the drum is a chain, to the end of which is connected a pair of tongs.

In addition to these parts of the machine there are six decatizing cylinders which consist of perforated copper cylinders, approximately 6'6'' long and 8'' in diameter. At one end of each of these cylinders there is a gear which when the cylinder is placed in position in the vat connects with a gear which is rotated directly by an electric motor.

There is also a device which rolls folded cloth on the perforated cylinders. This device is operated by an electric motor connected through a chain drive.

In addition, there is an extractor which consists of a vacuum pump driven by an electric motor through a silent chain drive. This motor, also through chain and gear mechanism, serves to rotate the perforated cylinder holding the cloth and also operates a folding mechanism which folds the cloth after it is unrolled from the cylinder.

In all, there were ten electric motors imported with this machine. Of these ten motors, eight are directly connected to the machine by means of couplings. The other two are connected to their units by chain drives.

The wet decatizing machine processes wool cloth which has been woven but which has not yet been napped or dyed. The cloth comes to the decatizing machine folded. The unfolding and winding-on mechanism referred to above winds the cloth about the perforated cylinders free from folds and wrinkles. When the machine is ready for operation, the first of the vats above referred to is filled with water of a temperature of 170° Fahrenheit. The second vat is filled with water at a somewhat lower temperature and the third vat is filled with water at room temperature. The purposes of the decatizing process are to set the fibres in the cloth; to make a smooth surface; and to prepare the cloth for the napping or teaseling process. The perforated cylinder about which the cloth to be processed has been wound is lifted by means of the overhead hoist and transported to the first vat where it is lowered into the water and the ends of the cylinder locked into the rotating mechansim described above, and at the same time is connected with the centrifugal pump referred to above. The electric motor which is connected to the rotating gear is then started as well as the motor activating the centrifugal pump and the water in the vat is alternately circulated through the cloth in two directions. This first step in the process takes some fifteen minutes, whereupon the perforated roller holding the cloth is by means of the electric hoist removed from the first vat and placed in the second and third vats where the same process is performed. When the cloth on the perforated roller is removed from the vats by means of the electric hoist, it is then placed

by means of the electric hoist into a cradle which is a part of the extracting unit. The suction pump referred to above then serves to extract the water from the cloth as the cloth is unwound from the perforated roller while passing over guide rollers and a vacuum slot to the folding mechanism where it is folded into approximately the same position as it was when the process started. Two photographic views of this wet decatizing machine are hereto attached and marked "Collective Exhibit 1–A".

4. Each of the two nap raising machines covered by this protest consists of two revolving cylinders approximately 3' in diameter and 6' wide. The surface of each of these rolls is fitted with twenty-four rows of teasel holding slots into which are placed teasels. An electric motor is coupled directly to one of these rolls and drives the other by means of gears. The electric motor and control for the same are designed for retarded starting of the equipment to prevent damage to the cloth. This is accomplished by insertion of a resistance in one phase of the three phase power circuit. This resistance is controlled by an electrically operated relay. The nap raising machines serve the purpose of creating a nap on the surface of the cloth which is accomplished by the action of the teasels coming into contact with the cloth. The cloth comes to the nap raising machine from the wet decatizing machine and prior to dyeing. Attached hereto are two different photographic views, marked "Collective Exhibit 2–A", of one of the nap raising machines showing some of the details of the electric drive.

5. The tenterizing machines imported serve by means of a drying process to remove from the cloth as it comes from the dyeing operation some 85% of the excess moisture contained in the cloth. This is accomplished by passing the cloth through a drying chamber where heated air is circulated by means of electrically driven fans. After the cloth leaves the tenterizing machine it goes through a number of other processes before it is finished, such as steaming, shrinking and conditioning. Each of the tenterizing machines imported consists of a drying chamber approximately 21'6" long, 8' wide and 13' high. Outside of the drying chamber is a feeding-in mechanism which receives the cloth which is in folds on a hand truck and which attaches it to a moving belt on each selvage which in turn conveys it through a drying chamber. The mechanism which attaches the cloth to the conveying belts is operated by two electric motors. Since the cloth as it comes to the machine varies in some slight degree in width, the attaching mechanism is so constructed as to automatically compensate for the variations in width and attach each section of the selvage to the conveying belts. In order to accomplish this result, the attaching mechanism automatically moves from side to side upon the shaft upon which it is mounted. The conveying belts are motivated by the main drive electric motor of the machine which is coupled by means of gears to nine intermediate drive shafts which in turn operate the conveying belts and serve to convey the cloth through the drying chamber. In addition to the electric motors already described, there is an electric motor which is connected to the sides of the drying chamber by means of gears and which serves to narrow or widen the width of the drying chamber and feeding mechanism in order to accommodate cloth of different widths. In addition to these electric motors there are two electric motors which by means of belts drive four fans. These fans serve to circulate hot air through the courses of cloth passing through the drying chamber. When the cloth emerges from the drying chamber it is folded on a hand truck by means of a folding mechanism operated by the main drive motor through gears and belts. Attached hereto is a photographic view, marked "Exhibit 3–A", of one of the tenterizing machines.

6. None of the machines described could be operated by any other source of power than the electric motors described in detail above without such alterations as would necessitate a complete redesigning of the machines and the addition of many mechanical features.

**226**

. It is further stipulated and agreed, subject to the approval of the Court, that the attached photographs marked "Collective Exhibit 1–A", "Collective Exhibit 2–A", and "Exhibit 3–A", may be received in evidence as Collective Exhibit 1–A, Collective Exhibit 2–A and Exhibit 3–A.

The collective exhibits mentioned in the stipulation were received in evidence.

The trial court overruled the protest and held that the involved merchandise was more specifically provided for in paragraph 372 than in paragraph 353, and also was of opinion that if upon appeal this court should hold that the competing paragraphs are equally specific, then it must be held that the merchandise is dutiable at the higher rate by virtue of that part of paragraph 1559 of the said act which provides "If two or more rates of duty shall be applicable to any imported article, it shall be subject to duty at the highest of such rates." From the judgment of the trial court this appeal was taken.

The pertinent portions of the competing paragraphs read as follows:

PAR. 372. * * * all other textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; * * *

PAR. 353. * * * articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; * * * 35 per centum ad valorem.

It is clear from the record that the machines herein involved are used in the manufacture of textile materials. As such they are within the scope of the above-quoted portion of paragraph 372. *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490; *Jett & Co.* v. *United States*, 18 C. C. P. A. (Customs) 86, T. D. 44044; *United States* v. *Asten Hill Mfg. Co.*, 25 C. C. P. A. (Customs) 123, T. D. 49243. It is also clear from the record that the machines are articles having as essential features electric motors and other electrical devices, such as are provided for in paragraph 353, *supra, United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050; *Ralph C. Coxhead Corp.* v. *United States, ibid.* 96, T. D. 47080. The main issue is one of law only, namely, whether or not the merchandise is more specifically provided for as "all other textile machinery * * * not specially provided for" than as "articles having as an essential feature an electrical element or device * * * not specially provided for" and a secondary issue is whether or not the above referred to provision of paragraph 1559 is applicable.

This court has definitely held that the provision of paragraph 372, *supra,* for "all other textile machinery or parts thereof, finished or unfinished, not specially provided for" was intended to cover all machines not specially provided for which are used in the manufacture of textiles. In other words, the said provision was held to be a classification by use. *Whitlock Cordage Co.* v. *United States, supra.* It has

also been held by this court that the provision of paragraph 353 herein involved is not a classification by use. *United States* v. *R. W. Cramer & Co., Inc.*, 22 C. C. P. A. (Customs) 45, T. D. 47049.

It is clear to us that in paragraph 353 Congress intended that all articles *ejusdem generis* with those named in the paragraph should, unless more specifically provided for elsewhere, take the rate of duty therein set out. Assuming, therefore, without deciding, that the involved merchandise may be *ejusdem generis* with the said named articles, nevertheless under the rule of construction that a classification by use prevails over a general classification or even an *eo nomine* designation, in the absence of a clear congressional intent to the contrary, it cannot be said that the pertinent provision of paragraph 372 does not more specifically provide for the imported merchandise than paragraph 353. See *Drakenfeld & Co.* v. *United States*, 2 Ct. Cust. Appls. 512, T. D. 32248; *Drakenfeld & Co.* v. *United States*, 9 Ct. Cust. Appls. 124, T. D. 37979; *United States* v. *Dunhill;* 13 Ct. Cust. Appls. 310, T. D. 41231; *United States* v. *A. W. Faber, Inc.*, 16 Ct. Cust. Appls. 467, T. D. 43211; *Henry Pels & Co.* v. *United States*, 27 C. C. P. A. (Customs) 1, C. A. D. 51; and *Fink* v. *United States*, 170 U. S. 584.

In view of the above, since the competing paragraphs are not equally applicable there is no reason for the application of paragraph 1559.

Congressional intent is to be gathered from the words used by the Congress, as contained in the laws, and also, among other things, by an examination, when necessary, of the legislative history connected with their enactment. In the instant case both parties urge that the legislative history of paragraph 353, *supra,* sustains their opposing contentions. This court has had occasion to review the legislative history of this paragraph, which first appeared in the Tariff Act of 1930. *United States* v. *R. W. Cramer & Co., Inc., supra; United States* v. *Dryden Rubber Co., supra; Ralph C. Coxhead Corp.* v. *United States, supra.* A further examination does not disclose to us that the said legislative history shows anything contrary to the legislative intent to be gathered from the language used in the paragraph and as interpreted by this court.

Since we have concluded that the legislative intent may be clearly understood from the language used in both paragraphs and that the legislative history discloses nothing contrary thereto, it follows as of course that our decision herein must follow the rule of construction involved in the doctrine of relative specificity, and we hold that the involved merchandise is properly classifiable as determined by the collector and as found by the trial court.

The case of *Keith Dunham Co.* v. *United States*, 26 C. C. P. A. (Customs) 250, C. A. D. 24, cited by appellant, is not applicable to the facts in this case. The question there involved was whether

or not parts of a "secator," which had as an essential feature an electrical element or device, and was a light, movable instrument which by means of the use of oxygen and acetylene burned through steel plates, were parts of a machine tool under the *eo nomine* provision of paragraph 372 or whether they were within the provision for "all articles having as an essential feature an electrical element or device, such as * * * portable tools * * * and parts thereof" in paragraph 353. In that case we held that the imported merchandise was not classifiable as parts of a machine tool under the provision of paragraph 372, *supra*, but that it was classifiable as parts of a portable tool which had as an essential feature an electrical element or device within the scope of paragraph 353. The question of relative specificity between the competing paragraphs was not considered.

We have examined the other cases cited by appellant, but deem it unnecessary to discuss them as they are not at all pertinent to the decision of this case.

The judgment of the United States Customs Court is affirmed.

BLAND, Judge, dissenting: The legislative history of the paragraphs involved, recited in numerous cases by this court, shows, I think, that the conclusion reached by the majority is erroneous, and I therefore dissent from the decision of the majority.