(C. D. 669)

W. X. Huber Co. v. United States

United States Customs Court, Second Division

(Decided July 22, 1942)

*Philip Stein* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *Richard H. Welsh*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

KINCHELOE, Judge: This is a suit brought by the plaintiff against the United States for the recovery of certain duty alleged to have been illegally levied on an importation of paper. The merchandise in question consists of paper disks, ranging in diameter from 2¼ up to 17 inches. They were reported by the examiner to be tissue paper disks, and were assessed with duty at the rate of 6 cents per pound and 20 per centum ad valorem under the mandatory minimum rate of duty provision of paragraph 1404 of the Tariff Act of 1930, as articles composed wholly of paper commonly or commercially known as tissue paper, or paper similar to tissue paper, weighing not over 6 pounds to the ream, whether in sheets or any other form. They are claimed to be properly dutiable as "filtering paper" at the rate of 5 cents per pound and 15 per centum ad valorem, as provided for in paragraph 1409 of said act.

On the issue herein one witness has testified, and he is M. M. Wheeler, connected with the firm of McMannus & Morgan, Inc., the importers of the merchandise in question. The witness stated that he is familiar with the imported merchandise, and introduced in evidence as collective exhibit 1 a sample package of the involved paper of the diameter of 3¼ inches. He stated it was representative of all the paper in issue, except as to size; that he handled such paper since 1929, and that for several years before then he had seen the paper used in filtering coffee; that he had not sold the paper prior to 1929, but it had been submitted to him by some exporters in Japan; that he saw this kind of paper used in homes and in restaurants in the brewing of coffee by the drip method (R. 8), which consists of inserting the paper at the bottom of a reservoir which is perforated with holes, then placing the coffee on top of the paper, and then pouring boiling water on top of the coffee. The water then drips and filters through the paper into the receptacle beneath, which is the filtered coffee. The witness stated further that he has never seen the paper disks used for any other purpose; that that has been its sole purpose, and has been true since 1929 to date; also that he has observed the use of collective exhibit 1 for over 20 years, and has imported it since

1929; that it is imported in circular form so as to fit the urns exactly for filtering coffee.

Upon being recalled as a witness, Mr. Wheeler stated that he has been connected with McMannus & Morgan for 11 years, and that they are engaged solely in the jobbing of paper and paper specialties of all descriptions, both imported and domestic, and that his work has been in the purchase and selling of such paper; that in the course of years he has had occasion to learn what tissue paper is by buying and selling it; that he became familiar with filtering papers by seeing them used and seeing the market for them; that he has seen filtering paper in other forms than exhibit 1, namely, chemical filtering papers cut in a different shape and of a different weight of paper. That he has seen sheets of paper from which articles like collective exhibit 1 have been cut; that he imported identical paper in sheets for cutting to special sizes of disks; that he imported the sheets on several occasions, and that they were rectangular, 24 by 36 inches; but that he never sold the sheets in any other form than as represented by collective exhibit 1, in other words, that he did not sell the sheets from which the disks were made; that he offered such paper for sale as printing paper, but was not successful (R. 19) because it was not strong enough; that he never offered sheets of such paper for sale as tissue paper, because they would not serve the purpose of tissue paper as that term is commonly used in the paper trade. He defined tissue paper as follows: "Tissue paper is a term that doesn't strictly define a type of paper as much as a use of paper. Ordinarily it is a thin paper, weighing between 4 and 9 pounds to a ream, used for wrapping. That is a general description." (R. 20/21.)

The witness then continued that tissue paper positively cannot be used for the same purpose as filtering paper or as collective exhibit 1; that he endeavored for a long time to obtain a tissue paper of any description or any other type that would be suitable for filtering purposes, and that, while he had samples submitted by every mill in the United States that makes paper of that type, he did not find one that could be used as a coffee filtering paper (R. 21); that he found any other paper was not strong enough when wet to serve as a filtering paper. The witness testified further as follows:

R Q. Would you say that articles like Collective Exhibit 1, whether in their disc form, or in their rectangular, or square sheet form, or any other form, could be used in the same manner as tissue paper?—A. They couldn't be used in the same manner as tissue, if you accept the common trade usage of tissue paper. I might say, that the paper in Collective Exhibit 1 is extremely strong while wet, due to long fibers, while dry it has very little strength, and that is its chief characteristic that makes it suitable for the purpose it is exhibited here for. As far as the paper in Collective Exhibit 1 being used as tissue paper, it for many reasons wouldn't be suitable.

R. Q. Give us some of the reasons.—A. As I said, it isn't strong enough while dry. It would be too expensive in comparison to tissue papers, domestic papers of that category, and those are the principal reasons.

R. Q. So that as a matter of fact, tissue paper has exactly the opposite characteristics to the filtering paper in Colléctive Exhibit 1 at bar, hasn't it?—A. Yes, in one respect, in the respect while wet.

R. Q. Isn't tissue paper stronger dry than it is when wet?—A. Tissue paper, yes.

R. Q. And filtering paper is strong at both times, is it, or stronger when wet?—A. It is stronger than given paper of the same type. What I am trying to say is that taking tissue paper, and say paper as shown in Collective Exhibit 1, the paper in Collective Exhibit 1 would be far stronger while wet than a tissue paper would.

R. Q. In view of your experience, would you say that Exhibit 1, or sheets from which they are produced, is or is not tissue paper?

*       *       *       *       *       *       *

A. I would say that it was not tissue paper.    (R. 22/23.)

The testimony of the witness also shows that, while he never saw any other sheets imported except those imported by himself, which were never used for any other purpose than cutting into disks for filtering purposes, he has seen similar disks in the hands of other importers and on grocery store counters.

On cross-examination the witness' attention was called to Lockwood's "Classification and Definition of Paper" and the definition on page 98 thereof reading as follows: "Tissue paper. A general term indicating a class of papers made in weights lighter than 10 to 12 pounds, 24 by 36, 480; made on Yankee or Harper machine generally, or on a single-cylinder machine; glazed or unglazed; of rag, sulphite or rope; used for a large variety of purposes," to which the witness agreed. He stated however that the paper before the court was hand-made.

The witness further stated that the chief uses of tissue paper are as wrapping, as a packing, and for protection, and that it is also used as inter-leaf sheets, and for sanitary purposes; that from his experience in handling the paper here in question it could not possibly be used as wrapping paper; that tissue paper is made on a machine, while the imported paper is hand-made.    (R. 27/28.)

In *United States* v. *Albrecht*, 27 C. C. P. A. 112 (C. A. D. 71), certain paper disks ranging from 2¼ to 14 inches in diameter were classified under the provisions of paragraph 1413 of said act of 1930, as "Papers * * * cut, die-cut, or stamped into designs or shapes, such as * * * bands, strips, or other forms, * * * not specially provided for," and certain of the merchandise had been assessed for duty at 6 cents per pound and 20 per centum ad valorem under the minimum rate provision of paragraph 1404 of said act, as articles composed wholly or in chief value of paper commonly or commercially known as tissue paper, or paper similar to tissue paper,

weighing not over 6 pounds to the ream, whether in sheets or any other form. The plaintiff claimed the merchandise to be dutiable under paragraph 1409 of said act under the *eo nomine* provision for "filtering paper," as in the present instance.

In the above case this court sustained the plaintiffs' claim in the belief they had shown chief use of the paper disks, at and prior to the passage of the Tariff Act of 1930, for filtering purposes, and we are still of that opinion.

The appellate court, however, in reversing our decision, stated among other things, as follows:

In this court appellees in their brief state:

The cutting or stamping of the imported paper into the form of disks does not create a new or different article nor does it remove the paper from the category of filtering paper. * * *.

No issue has been tendered on this question and we will proceed to decide the issue upon appellees' theory that no new article has emanated by a manufacturing process from the paper from which the disks were cut. Obviously, if no new article has resulted, the paper from which the disks were cut must necessarily have been filtering paper if the articles of the present importation are filtering paper. Therefore, in considering whether the importation should be regarded as filtering paper, it is necessary that proof as to chief use must cover not only the article imported but also the paper from which it was cut.

It is obvious from the record that the importers never attempted to prove that merchandise of the class to which the imported merchandise belongs was chiefly used for filtering purposes prior to and on the date of the passage of the tariff act, although appellees very earnestly contend in argument in this court that "All the evidence shows that this merchandise is and always has been used exclusively for filtering purposes."

As a matter of fact, however, the evidence of two of plaintiffs' witnesses in the above case showed the *sole* use of the merchandise therein at and prior to the enactment of said act to be for filtering purposes, one testifying as to the use of the paper disks 12 years before trial (1937 or 1938), and the other for 20 years before that time.

In the present case the only testimony before us on the issue involved is that of plaintiff's witness, M. M. Wheeler, which stands uncontradicted. However, we think it sufficiently shows, at least *prima facie*, that the paper from which the imported disks have been cut is not commonly or commercially known as tissue paper. This would therefore seem to eliminate paragraph 1404 as applicable to the merchandise, and leave the issue between paragraph 1413, as "Papers * * * cut, die-cut, or stamped into designs or shapes, such as initials, monograms, lace, borders, bands, strips, or other forms, * * * and not specially provided for," and the provision of said paragraph 1409 for "filtering paper." It will be noticed that the former provision is qualified with the phrase "and not specially provided for," while the latter provision for filtering paper is without such qualification.

On the issue thus narrowed down we think the testimony of the plaintiff's witness herein further shows that the imported disks, as well as the paper from which they were cut, consist of paper made by hand and of long, tough fibers which withstand the effect of hot water and make the paper peculiarly fit for filtering coffee. The same witness stated that he and his firm sold the paper in disk form solely as filtering paper for filtering coffee at and prior to the passage of the Tariff Act of 1930, and that he never knew of any other use for such disks. He also stated that the only use made by his firm of the same kind of paper in sheet form, was, at and prior to the passage of said tariff act, for cutting into disks to fit coffee urns for the filtering of coffee, and that he knew of no other use for same.

The principle of law enunciated in the case of *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T. D. 40668, is very applicable in the present instance. The court said there in part, as follows:

Merchants purchase and importers import goods for sale and their testimony as to the known uses and consumers of the commodities in which they deal, coupled with the statement that they know of no other uses and no other consumers, is competent testimony and has a probative value which entitled it to be weighed as evidence.—*Klipstein* v. *United States* (1 Ct. Cust. Appls. 122; T. D. 31120). Whether a witness was a farmer, a dealer in fertilizers, or a manufacturer of fertilizer, he could testify only to such uses of tankage as were within his knowledge and to reject such evidence because there *might* be other known uses for the merchandise, would impose on the protestants an evidential requirement which could not possibly be met.

The testimony submitted by the importers shifted to the Government the burden of proceedings and if the importation was used for other than fertilizer purposes, it was the duty of the Government to introduce evidence to that effect. The Government having failed to assume that burden and having elected to leave the classification of the collector entirely unsupported, we must hold that the importer has made out a *prima facie* case, and that the merchandise is free of duty under paragraph 499 of the act of 1913.

In our opinion, we think it has been shown, at least *prima facie*, in the present case that the paper disks of the kind under consideration, as well as the paper from which they were cut, were at and before June 17, 1930, chiefly used for filtering purposes, and that they therefore come within the purview of paragraph 1409 of said act, as filtering paper, which provision we consider more specific than paragraph 1413 as applied to the merchandise.

The claim of the plaintiff under paragraph 1409 is therefore sustained, but is overruled in all other respects. Judgment will be rendered accordingly.